IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL GEORGE, | |
| *Plaintiff*, | Civil Action |
| v. | No. 23-cv-3939 |
| PIEDMONT AIRLINES, INC., | |
| *Defendant*. | |

**MEMORANDUM OPINION**

**Goldberg, J.**                                                                                                          **January 3, 2025**

Defendant Piedmont Airlines, Inc. moves for dismissal of the claim raised against it by its former employee Daniel George pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301, *et. seq.* Because this matter is barred by operation of the Railway Labor Act, 45 U.S.C. § 151, *et. seq.*, this court lacks subject matter jurisdiction. As such, the motion to dismiss will be granted, and the complaint dismissed.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

The facts taken from Plaintiff's Complaint are as follows: Plaintiff George began working as a First Officer/Pilot for Defendant Piedmont on March 5, 2018, flying various routes lasting between two to five days at a time, beginning and ending in Charlotte, NC. (Compl., ¶ 10). In addition to his employment with Piedmont, George was also a commissioned Lieutenant Colonel in the United States Air Force Reserve. In that capacity, he was a qualified employee and member

1

of the uniformed services within the meaning of USERRA, 38 U.S.C. § 4303(3), (9), (16). (Id., ¶ 2).

In the Fall of 2019, Plaintiff received notice of long-term military orders to begin on October 1, 2019, and he promptly notified Piedmont of his upcoming deployment. (Id., ¶ 12). He remained on Piedmont's Pilots Seniority List while on military duty. (Id., 13). Some two years later, Piedmont offered a Pilot Retention Bonus Program which became available in September of 2021 and was intended to incentivize its Pilots to pursue positions at American Airlines, of which it was a wholly-owned subsidiary. (Id., ¶¶13-14). The program was memorialized in a "Letter of Agreement between Piedmont Airlines, Inc. and the Airline Pilots in Service of Piedmont Airlines, Inc., as represented by The Airline Pilots Association International," which was signed on October 1, 2021 ("LOA"), and made a part of the Collective Bargaining Agreement ("CBA") between the two parties. (Id., ¶ 13). Under the LOA, "[o]nly pilots who are on the Piedmont Airlines Pilots' Seniority List as of the Effective Date (September 1, 2021) and pilots hired by Piedmont and added to the Piedmont Airlines Pilots' Seniority List on or before December 31, 2022, shall be eligible to participate in the Program. . . ." (Id.). Because Plaintiff was on the Seniority List, he was eligible to participate. (Id.).

The program offered incentive payments/bonuses in the amount of $70,000 to those "Pre-Flow" Piedmont pilots[1] who within one year of the program's effective date (September 1, 2021) were hired by American while employed by Piedmont. (Id., ¶ 14). In November 2021, while still on military service, Plaintiff interviewed and was offered a pilot position with American Airlines, and was given a class date of December 29, 2021 to officially commence employment. (Id., ¶ 15).

---

[1] "Pre-Flow" pilots were defined in the LOA as "current and future Piedmont pilots who are eligible to participate in the Program but have not yet been offered the opportunity to flow to American." (Compl., ¶ 14).

On December 9, 2021, Plaintiff advised Piedmont's Regional Chief Pilot, Bradley Fields, of his receipt of a job offer from American and his intention to resign from Piedmont. (Id., ¶ 16). Plaintiff additionally stated that it was his understanding he was entitled to the $70,000 bonus, and asked if there was anything he needed to do "to make that happen?" (Id.). Fields confirmed that Plaintiff was entitled to the bonus and told him "it should happen automatically." (Id., ¶ 17). As per Fields' directive, Plaintiff sent an email resigning from Piedmont, effective December 28, 2021 "in order to start employment at American Airlines." (Id., ¶ 17).

The following day, December 10, 2021, Fields called Plaintiff and told him that because he was on military leave of absence, his resignation from Piedmont was effective immediately, rather than his stated date of December 28. On December 20, 2021, after making several inquiries to Piedmont's Human Resources personnel about whether he could contribute the $70,000 bonus to his 401k plan, Plaintiff was informed that he would not receive the bonus because he did not meet "qualifying hours." (Id., ¶¶ 19-20).

Plaintiff thereafter contacted Captain Ryan Miller, a representative for the Air Line Pilots Association ("ALPA") and informed him of Piedmont's refusal to pay the bonus. (Id., ¶ 21). Miller responded on January 6, 2022, and told Plaintiff he would discuss the issue with Piedmont's Director of Flight Operations, but if there was no resolution, a grievance would be filed. (Id.). Several weeks later, on January 24, 2022, Plaintiff sent an email to American Airlines Manager Timothy Cook, advising he was resigning his employment with American, "in part because of Piedmont's refusal to pay [him] the 'Direct Hire' bonus. (Id., ¶ 22).

On February 25, 2022, a grievance was filed on Plaintiff's and ALPA's behalf regarding Piedmont's refusal to pay Plaintiff the $70,000 bonus. (Id., ¶ 23). On December 8, 2022, a hearing on the grievance was held before an arbitrator, Lawrence Holden. (Id., ¶ 24). At the hearing,

3

Piedmont stated that the reason for its refusal to pay Plaintiff the bonus was his failure to apply for re-employment after completing his military service. Thus, Plaintiff was not employed by Piedmont when he was hired by American. (Id.). In a written opinion issued on February 28, 2023, Arbitrator Holden agreed with Piedmont and found that because Plaintiff was not a Piedmont employee on the date American hired him, he was ineligible for the $70,000 bonus under the terms of the LOA. (Id., ¶ 25). On October 11, 2023, Plaintiff filed this action asserting Piedmont violated USERRA in denying him the bonus.

## II.     LEGAL STANDARDS

Defendant moves to dismiss Plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). First, Defendant asserts Plaintiff's claim is barred by operation of the Railway Labor Act, 45 U.S.C. § 151, *et. seq.* insofar as it establishes that arbitration boards such as the one used to adjudicate Plaintiff's grievance have exclusive jurisdiction to resolve disputes involving interpretation and application of collective bargaining agreements in the airline industry. Consequently, this court lacks subject matter jurisdiction to entertain this action. Alternatively, Defendant submits the doctrine of *res judicata* operates as an independent bar to Plaintiff's suit. Should the court decline to dismiss on these grounds, Defendant further argues the complaint fails to state a claim to relief under USERRA because it fails to specifically allege the facts necessary to satisfy the pleading standards established under Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009).

The basic difference among the various 12(b) motions is that 12(b)(6) alone necessitates a ruling on the merits of the claim, whereas the others deal with procedural defects. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). "Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the

safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn." Id. Thus, the distinction between Rules 12(b)(1) and 12(b)(6) is important because the 12(b)(6) standard affords significantly more protections to a nonmovant. Hartig Drug Co. v. Senju Pharm. Co., 836 F.3d 261, 268 (3d Cir. 2016).

Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim. In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). A rule 12(b)(1) motion may proceed in two ways: it may attack the complaint on its face, or on its facts. Mortensen, 549 F.2d at 891. A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present." Constitution Party v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014). A factual attack is an argument that there is no subject matter jurisdiction because the facts of the case do not support the asserted jurisdiction. Id. "In sum, a facial attack contests the sufficiency of the pleadings, whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." Id. (internal quotation marks and citations omitted). In resolving a facial attack, the court applies the same standard of review used in considering a Rule 12(b)(6) motion, that is, it views "the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Id. (quoting In re Schering Plough, 678 F.3d at 243). In contrast, "a court may weigh and consider evidence outside the pleadings" in evaluating a factual challenge. Id. (internal citation omitted).

5

On the other hand, to withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." Iqbal, 556 U.S. at 678. A complaint "does not need detailed factual allegations" but it must contain something "more than labels and conclusions," Twombly, 550 U.S. at 555, and the plausibility standard requires a pleading to show "more than a sheer possibility that a defendant has acted unlawfully." Connelly v. Lane Constr. Corp., 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citation omitted). "A facially plausible claim is one that permits a reasonable inference that the defendant is liable for the misconduct alleged." Doe v. Univ. of the Scis., 961 F.3d 203, 208 (3d Cir. 2020) (citing Iqbal, 556 U.S. at 678).

## III.   DISCUSSION

In invoking the Railway Labor Act as the basis for its Rule 12(b)(1) motion to dismiss, Defendant is factually challenging this court's subject matter jurisdiction. Thus, evidence outside the pleadings is properly considered, including the terms of the LOA and the collective bargaining agreement between Piedmont and ALPA.[2]

The Railway Labor Act ("RLA") "is intended to 'promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes.'" Stouffer v. Union R. R. Co., LLC, 85 F.4th 139, 143 (3d Cir. 2023) (quoting Hawaiian Airlines, Inc. v. Norris,

---

[2] As recited in the Preamble to the *Agreement Between Piedmont Airlines, Inc. and the Air Line Pilots in the service of Piedmont Airlines, Inc. as represented by the Air Line Pilots Association, International* (effective April 1, 2013), that is, the CBA:

> THIS AGREEMENT is made and entered into in accordance with the provisions of the Railway Labor Act, as amended, by and between PIEDMONT AIRLINES, INC. (hereinafter referred to as the "Company") and the air line pilots in the service of the Company, as represented by the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter known as the "Association").

(Def.'s Mot. to Dismiss, Ex. B, ECF No. 15-2).

6

512 U.S. 246, 252 (1994)). The RLA has been extended to the airline industry and requires contractual controversies involving collective bargaining agreements to be submitted to an arbitration board. International Ass'n of Machinists v. Central Airlines, Inc., 372 U.S. 682, 685 (1963). "The arbitral board's jurisdiction is exclusive and cannot be avoided by efforts to bring [a] dispute directly into court." Air Line Pilot's Ass'n, Int'l v. Northwest Airlines, Inc., 627 F.2d 272, 275 (D.C. Cir. 1980) (citing, *inter alia,* Andrews v. Louisville & N. R. R., 406 U.S. 320, 325 (1972)). Thus, the RLA has established a "mandatory arbitral mechanism for the prompt and orderly settlement" of both "major" and "minor" disputes. Stouffer, 85 F. 4th at 143-144. "Major disputes relate to the formation of CBAs." Id. at 144. "Minor disputes are those growing out of the interpretation or application of existing CBAs," and "involve controversies over the meaning of an existing CBA in a particular fact situation" – they arise out of efforts to enforce contractual rights. Id. (internal citations omitted). "The 'distinguishing feature' of a minor dispute is that it 'may be conclusively resolved by interpreting the existing agreement.'" Id. (quoting Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n., 491 U.S. 299, 305 (1989)).

Under Section 20A of the CBA between Piedmont and its pilots, a two-step written grievance process is provided for disputes "between the parties growing out of an interpretation or application of any of the terms of this Agreement" which is available to "[a]ny pilot or group of pilots." (Id., 20-1). Upon receipt of a timely and properly filed grievance, an initial hearing is held within fifteen days by the Vice President of Flight Operations or his designee, and a written decision is issued by the Company within ten days following completion of the hearing. (Id.). If the decision is not satisfactory to either the pilot(s) or the Association, the case may be appealed within thirty days to the System Board of Adjustment. (Id.). This is the process which was

7

followed here and which culminated in the arbitration decision issued on February 28, 2023 in Piedmont's favor. (Def.'s Mot. to Dismiss, Exs. A, E, F, G, H).

"Generally, the RLA will not bar a plaintiff from bringing a claim under an independent federal statute in court, but a federal claim that depends for its resolution on the interpretation of a CBA lacks independence from the CBA and the RLA precludes it." Stouffer, 85 F.3d at 144 (quoting Giles v. Nat'l R.R. Pasenger Corp., 59 F.4th 696, 702-703 (4th Cir. 2023)). In assessing whether a federal claim depends on how the CBA is interpreted, it is appropriate to look first to the source of the asserted right, and whether the claim stems from the federal statute or from the CBA itself. Id. at 145. If the claim stems from the federal statute, it is not precluded by the RLA. Id.; Prolenski v. Transtar LLC, Civ. No. 21-545, 2024 U.S. Dist. LEXIS 80947 at *14 - *15 (W.D. Pa. May 3, 2024). However, if the meaning of a collective bargaining agreement must be ascertained in a particular fact situation generally involving only one employee, the RLA governs. See, e.g., Brotherhood of RR Trainmen v. Chicago River & Indiana RR Co., 353 U.S. 30, 33-34 (1957) .

Turning to the federal statute on which Plaintiff bases his claim, I find there are multiple purposes behind USERRA. These are: (1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed service as well as to their employers by providing for the prompt reemployment of service members upon their completion of service; and (3) to prohibit discrimination against them because of their uniformed services. Gordon v. WaWa, Inc., 388 F.3d 78, 84-85 (3d Cir. 2004) (citing 38 U.S.C. § 4323(d) – (e), (h)). In keeping with these goals,

USERRA's remedial purposes are designed to prevent, and to compensate a service member for, employment discrimination based on military status. Id.

But the gravamen of Plaintiff's claim here does not originate from either the language or the underlying goals of USERRA. Instead, it emanates from a bonus provision created in LOA 44 and made a part of the parties' CBA on October 1, 2021. (Def.'s Mot. to Dismiss, Ex. C.). In establishing the Pilot Retention and Bonus Program pursuant to which Plaintiff seeks to be paid a $70,000 bonus, LOA 44 provides the following in relevant part at subsection "A":

> 1. . . . The effective date of the Program shall be September 1, 2021 (the "Effective Date"). Only pilots who are on the Piedmont Airlines Pilots' Seniority List as of the Effective Date and pilots hired by Piedmont and added to the Piedmont Airlines Pilots' Seniority List on or before December 31, 2022, shall be eligible to participate in the program. . . .
>
> 2. The Program allows eligible pilots who satisfy the Program's requirements as set forth in this Agreement to receive up to a maximum of $150,000. . . . *In order to be eligible to receive any payment under the terms of this Program, a Piedmont pilot must satisfy all requirements applicable to such payment and also be employed by Piedmont and on the Piedmont Airlines Pilots' Seniority List on the date such payment is made.* (emphasis added).
>
> . . .
>
> 6. To be eligible to receive the payments set forth above . . . a Piedmont pilot must have completed sufficient work for the Company based on Qualifying Hours in the applicable 12-month period preceding payment. For purposes of the Program, and this Agreement, Qualifying Hours means 864 or more hours during the applicable 12-month period. In determining whether a pilot has satisfied this requirement, any absences under . . . Section 13 (Leave of Absence) will be credited for up to a combined total of 164 hours. . . .

Id.

In adjudicating the Plaintiff's grievance, the arbitrator considered Part 1002 of the Regulations under USERRA, 20 C.F.R. § 1002.115(c). That provision, which applied to periods of service that were more than 180 days in length, reads:

9

> If the employee's period of service in the uniformed services was for more than 180 days, he or she must submit an application for reemployment (written or verbal) not more than 90 days after completing service.

The arbitrator went on to find:

> The evidence in the George case demonstrated that First Officer George never applied for reemployment as required under the Regulation cited above. Thus, he was not a Piedmont employee at the time of hire by American Airlines in December 2021, and he, therefore, did not meet the requirement of being a Piedmont employee – a necessary qualification – at the time of hire by American.

Notwithstanding the arbitrator's use of a USERRA regulation to assist him in understanding the meaning of "employed at the time of hire" within the meaning of the collective bargaining agreement, this does not alter the fact that this dispute arises out of Plaintiff's efforts to enforce a right created by a contract – not a right conferred by the statute. It is therefore the meaning of the *agreement* which determines Plaintiff's entitlement to the relief he is seeking. Accordingly, I find this case involves a dispute "involv[ing] duties and rights created or defined by the CBA," Stouffer, 85 F.3d at 144, and as such, it is barred by the RLA.

Defendant's motion to dismiss for insufficient subject matter jurisdiction pursuant to Rule 12(b)(1) must therefore be granted, and the case dismissed.

An appropriate Order follows.